UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN GASCOIGNE AND KELLY GASCOIGNE, INDIVIDUALLY, AND AS MOTHER AND NEXT FRIEND OF AD.G. AND AB.G., BOTH MINORS, <br><br> Plaintiffs, <br><br> vs. <br><br> WEQUASSETT INN LLP (a registered limited liability partnership, by and through its individual partners), d/b/a THE WEQUASSETT INN RESORT AND GOLF CLUB <br><br> Defendant. | C.A. NO. 04 CV 11168 JLA |

PLAINTIFFS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

In accordance with Local Rule 56.1, the Plaintiffs Stephen Gascoigne and Kelly Gascoigne, Individually, and as Mother and Next Friend of AD.G. and AB.G., both minors, hereby submit their concise statement of undisputed material facts as to which they contend there is no genuine issue to be tried, accompanied by references to the appropriate affidavits, depositions, discovery responses, documentation, and other portions of the record. For the convenience of the Court, all such referenced exhibits can be found in the pleading entitled Affidavit of Donald L. Gibson, Esquire, which is filed separately herewith.

PLAINTIFF'S STATEMENT OF UNDISPUTED
MATERIAL FACTS AND RECORDED REFERENCES

Fact No. 1: At all times material to this action, the Defendant Wequassett Inn LLP was doing business as the Wequassett Inn.

Source: Defendant's Response No. 1 To Plaintiff's Request For The Admission of Facts And Genuineness of Documents [Exhibit 10].

Fact No. 2: At all times material to this action, the Defendant Wequassett Inn LLP owned, operated, managed, and staffed the Wequassett Inn.

Source: Defendant's Response No. 2 to Plaintiff's Request For The Admission Of Facts And Genuineness Of Documents [Exhibit 10].

Fact No. 3: The Defendant Wequassett Inn LLP entered into a contractual agreement with Scott Dien and Rebecca Dupont of La Canada, California, to host a wedding ceremony, cocktail reception, and dinner (hereinafter, "the Dien-Dupont wedding and dinner/reception") on the evening of July 6, 2001, commencing at 6:00 p.m., for approximately 110 people at a cost of $125.00 per person plus 5% tax and 18% service charge.

Source: Defendant's Answers No. 4, 5, and 6 to Interrogatories of the Plaintiff Scott Dien in Scott Dien and Rebecca Dupont vs. Pleasant Bay Group, Inc. d/b/a The Wequassett Inn Resort and Golf Club, Barnstable (MA) Superior Court, Civil Action No. 04-352-A [Exhibit 16].

Fact No. 4: That same evening, July 6, 2001, the Defendant Wequassett Inn LLP also hosted a dinner on its premises for a function known as Invest To Compete.

Source: Defendant's Answer No. 11 to Interrogatories of the Plaintiff Scott Dien in Scott Dien and Rebecca Dupont vs. Pleasant Bay Group, Inc. d/b/a The Wequassett Inn Resort and Golf Club, Barnstable (MA) Superior Court, Civil Action No. 04-352-A [Exhibit 16]; Depo. Tr. of Mark Novota (P29, L19-P30, L19) [Exhibit 14].

Fact No. 5: The Invest To Compete function was being serviced through the main kitchen of the Wequassett Inn, and the Dien-Dupont wedding reception/dinner was being serviced through the pavilion kitchen.

Source: Depo. Tr. of Mark Novota (P31, L9-19) [Exhibit 14].

Fact No. 6:  The Plaintiff Stephen William Gascoigne resides at 450 Hanson Lane, Whitefish, Montana.

Source:  Answer No. 1 of Plaintiff's Answers To Defendant's First Set of Interrogatories [Exhibit 1].

Fact No. 7:  The Plaintiff Stephen William Gascoigne attended the wedding and wedding dinner/reception of Scott Dien and Rebecca Dupont held at the Wequassett Inn on Friday, July 6, 2001.  He was a member of the wedding party.

Source:  Dep. Tr. of Stephen W. Gascoigne (P107, L21-P108, L2) [Exhibit 2].

Fact No. 8:  At the time, the Plaintiff Stephen William Gascoigne had no prior illnesses, diseases or injuries of any kind concerning his gastrointestinal system or the various joints of his body.

Source:  Answer No. 5 of Plaintiff's Answers To Defendant's First Set of Interrogatories [Exhibit 1];  Medical Records of Bernadette Van Belois, M.D., at Tamarack Medical Clinic, 1280 Burns Way, Kalispell, Montana [Exhibit 5]; Medical Records of Dr. Robert Kowalewski of University of Washington Medical Center Department of Rheumatology [Exhibit 6]; Medical Records of Dr. Rodney Bluestone [Exhibit 7].

Fact No. 9:  The Plaintiff Stephen William Gascoigne and his family flew from Calgary, Alberta, Canada, to Boston, MA on July 4, 2001.

Source:  Depo. Tr. of Stephen W. Gascoigne (P108, l14-18; P109, L1-4) [Exhibit 2].

Fact No. 10:  Upon arriving in Boston, the Plaintiff Stephen William Gascoigne and his family rented a car and drove directly to the Wequassett Inn, where they had reserved a room.

Source:  Depo. Tr. of Stephen W. Gascoigne (P109, L20-P110, L9; P110, L10-13) [Exhibit 2].

 Fact No. 11:  On Friday, July 6, 2001, the Plaintiff Stephen William Gascoigne ate breakfast at the Wequassett Inn.

Source:  Depo. Tr. of Stephen W. Gascoigne (P112, L10-11)  [Exhibit 2].

Fact No. 12: On Friday, July 6, 2001, the Plaintiff Stephen William Gascoigne ate lunch at a local restaurant called The Crab Pot. His lunch consisted of fish and chips.

Source: Depo. Tr. of Stephen W. Gascoigne (P111, L1-11) [Exhibit 2].

Fact No. 13: During the afternoon of July 6, 2001, and prior to the Dien-Dupont wedding ceremony, the Plaintiff Stephen W. Gascoigne ate a grilled cheese sandwich at the grill at the Wequassett Inn.

Source: Depo. Tr. of Stephen W. Gascoigne (P112, L3-9) [Exhibit 2].

Fact No. 14: After the Dien-Dupont wedding ceremony, the Plaintiff Stephen W. Gascoigne ate a portion of shrimp cocktail and some lobster hors d'oeuvres at the reception area at the Wequassett Inn. He then was seated for dinner.

Source: Depo. Tr. of Stephen W. Gascoigne (P112, L12-21) [Exhibit 2].

Fact No. 15: During dinner at the Wequassett Inn, the Plaintiff Stephen W. Gascoigne consumed, among other things, turkey, vegetables, béarnaise sauce, clam chowder, salad, and a dinner roll. He did not have any wedding cake.

Source: Depo. Tr. of Stephen W. Gascoigne (P112, L23-P113, L7) [Exhibit 2].

Fact No. 16: The food items served to the Dien-Dupont wedding party and invited guests and to the attendees of the Invest To Compete dinner were all served by employees of the Defendant Wequassett Inn LLP, some buffet style and some at serving stations.

Source: Depo. Tr. of Mark Novota (P28, L10-P29, L18; P37, L1-P38, L13) [Exhibit 14].

Fact No. 17: Among the common food items served to persons at both events were beef tenderloin, béarnaise sauce, butter, vegetables, and dinner rolls, and perhaps certain salads and salad dressings. All of these were prepared in the main kitchen of the Wequassett Inn, except for the rolls which were either prepared in the pavilion pastry kitchen if done from scratch or the main kitchen if prepackaged.

Source: Depo. Tr. of Mark Novota (P40, L7-P44, L13; P64, L10-19) [Exhibit 14].

Fact No. 18: The Plaintiff Stephen W. Gascoigne first began feeling ill on the evening of July 7, 2001, at approximately 8:00 p.m. while waiting in line to be seated with his family to dine at a restaurant on Cape Cod. He began to experience severe chills, fever, shaking, and sweats. He excused himself, went to the men's room, and experienced diarrhea. He returned to his family and informed them he would wait for them in the car, where he waited with the heater on for approximately an hour and fifteen minutes while they finished their meals.

Source: Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1]. Depo. Tr. of Stephen W. Gascoigne (P113, L17 - P115, L5) [Exhibit 2].

Fact No. 19: Upon arriving back at the Wequassett Inn and throughout the course of the night, the Plaintiff Stephen W. Gascoigne experienced shaking, fever, chills, diarrhea, extreme abdominal cramps, burning in his mouth, body cramping, and blood in his stool. He was unable to sleep and was up all night. He experienced a rising fever.

Source: Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1]. Depo Tr. of Stephen W. Gascoigne (P115, L21 - P116, L4; P117, L13-14; P118, L6-8) [Exhibit 2].

Fact No. 20: The Plaintiff's symptoms continued during the morning of Sunday, July 8, 2001, as he and his family checked out of the Wequassett Inn. They were scheduled to spend the day on Martha's Vineyard before driving to the Millennium Bostonian Hotel in Boston. Because of his deteriorating condition, the Plaintiff did not accompany his family onto the ferry to the Vineyard. Instead, he remained in the rental car in the ferry parking lot with the heater on. He spent the day walking back and forth from the rental car to the public restrooms or sleeping in the rental car with the heater on. He went to the bathroom approximately ten (10) times while he waited for his family to return.

Source: Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1]. Depo. Tr. of Stephen W. Gascoigne (P118, L11-P121, L8; P121, L12-P122, L3) [Exhibit 2].

<u>Fact No. 21</u>:  When his family returned to the ferry parking lot around 7:00 or 8:00 p.m., they found the Plaintiff asleep in the car.  They woke him up, and his father-in-law drove them to Boston where they arrived at their hotel around midnight.  On the way, they had to stop three or four times for the Plaintiff to use the restroom.

Source:  Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1].  Depo. Tr. of Stephen W. Gascoigne (P122, L21-P124, L8) [Exhibit 2].

<u>Fact No. 22</u>:  During the night of Sunday, July 8, 2001, the Plaintiff continued to experience cramping, chills, fever, and bloody diarrhea.  He spent most of the night lying on the bathroom floor with a towel in his hotel room.

Source:  Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1].  Depo. Tr. of Stephen W. Gascoigne (P124, L13-19) [Exhibit 2].

<u>Fact No. 23</u>:  On Monday, July 9, 2001, the Plaintiff continued to feel "horrible".  He was tired, achy, and crampy.  He had diarrhea and bloody stools.  He remained in bed all day in his hotel room with frequent trips to the bathroom.

Source:  Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1].  Depo. Tr. of Stephen W. Gascoigne (P124, L1-13; P127, L13-15); [Exhibit 2].

<u>Fact No. 24</u>:  The Plaintiff and his family stayed at the Bostonian Hotel Monday night, July 9, 2001; and Tuesday night July 10, 2001; and departed for Calgary, Alberta, Canada on Wednesday, July 11, 2001.  During this period of time, the Plaintiff remained in his hotel room.  He was still experiencing diarrhea accompanied by bloody stools and was achy and feverish.

Source:  Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1].  Depo. Tr. of Stephen W. Gascoigne (P127, L13-15; P128, L5-P129, L3; P129, L14-15) [Exhibit 2].

<u>Fact No. 25</u>:  On Wednesday, July 11, 2001, the Plaintiff and his family flew back to Calgary, Alberta, Canada, via Chicago.  The Plaintiff had to use the restroom six to eight times on each leg of the flight.  He still had traces of blood in his stool.  He did not sleep on the flight.

Source:  Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1].  Depo. Tr. of Stephen W. Gascoigne (P129, L16-P131, L7) [Exhibit 2].

Fact No. 26: The Plaintiff and his family stayed in Calgary at his father-in-law's condominium. The Plaintiff continued to experience frequent diarrhea. They had originally intended to spend an entire week in Calgary from July 11, 2001, through July 18, 2001, so that they could attend the Calgary Stampede rodeo and related activities. Because the Plaintiff had been sick and weak for so long, he just wanted to return home to Montana, which he and his family did on Monday, July 16, 2001. The Plaintiff did not venture out of the condominium until Saturday, July 15, 2001, the day he ate his first meal since the Dien/Dupont wedding and dinner/reception. The Plaintiff continued to go to the restroom four to six times per day.

Source: Answer No. 2 of Plaintiff's Answers to Defendant's Interrogatories [Exhibit 1]. Depo. Tr. of Stephen W. Gascoigne (P131, L12-P134, L3; P134, L4-P135, L15) [Exhibit 2].

Fact No. 27: On or about Monday, July 9, 2001, management level personnel at the Wequassett Inn began receiving the first of what would eventually be multiple complaints from persons claiming to be ill who had attended either the Dien-Dupont wedding and dinner/reception or the Invest to Compete dinner on July 6, 2001. The possibility that a food borne illness was responsible was entertained.

Source: Depo. Tr. of Mark Novota (P54, L14-P59, L3; P69, L20-P70, L9) [Exhibit 14].

Fact No. 28: The Massachusetts Department of Public Health (hereinafter, MPH) and the Harwich Board of Health (hereinafter, HBOH) investigated these complaints at the WEQUASSETT INN which resulted from the events of July 6, 2001. MPH and HBOH also conducted a statistical analysis of stool samples obtained from and questionnaires completed by a large number of the Dien-Dupont wedding guests and Invest To Compete participants. Forty-six Dien-Dupont wedding and dinner/reception attendees and fifteen Invest To Compete attendees reported becoming ill following the dinner meal that was served at both functions. MPH and HBOH determined that there had been a Salmonella outbreak and that the strain of Salmonella involved

was Salmonella enteritidis (SE). MPH and HBOH concluded that the béarnaise sauce that was prepared and served on July 6, 2001, at both events was made wholly or in part with unpasteurized eggs contaminated with Salmonella enteritidis. An alternative explanation suggested by the MPH and HBOH for the Salmonella outbreak was that at least three of the Wequassett Inn food handlers at the events were already infected with Salmonella enteritidis bacteria and that one or more than one of these food handlers contaminated the food for the two functions, including the béarnaise sauce, as it was being prepared and served. This phenomenon of transmission is known as cross-contamination.

Source: Report of Massachusetts Department of Public Health dated October 1, 2001 [Exhibit 3].

Fact No. 29: MPH submitted certain stool samples which had been obtained to the Centers for Disease Control and Prevention (hereinafter, "CDC") for testing. By means of a memorandum dated December 5, 2001, Johnson G. Nsubuga of the Division of Epidemiology and Immunization of MPH announced that the test results showed that the Salmonella enteritidis isolated from the stool samples of the food handlers, the ill members of the Dien-Dupont wedding party, and the ill investment group attendees was identical (phage type 8). According to Mr. Nsubuga, the CDC findings further confirmed that the Salmonella enteritidis organism was either introduced as a result of contamination during food preparation or service by a food handler, or was present in the food that was served at both functions at the Wequassett Inn.

Source: December 5, 2001 Memorandum of Johnson G. Nsubuga [Exhibit 4].

Fact No. 30: It was not until he returned to Montana on July 16, 2001, that the Plaintiff learned that other members of the wedding party and others of the invited guests at the Dien-Dupont wedding and dinner/reception were ill and reporting symptoms similar to his. He was told that they were suffering from "Salmonella poisoning".

Source: Depo. Tr. of Stephen W. Gascoigne (P127, L20-P128, L4; P138, L6-14) [Exhibit 2].

Fact No. 31:  On October 31, 2001, the Plaintiff was seen for the first time by Dr. Bernadette Van Belois, a rheumatologist in Kalispell, Montana, at the request of his wife, to investigate the source and cause of aches and pains he had begun to experience after July 6, 2001, in certain of his joints at the time he was suffering from his abdominal cramping and diarrhea.  He had aches and pains in the knuckle joints of both hands, in the thumb joints of both hands, in his wrists, both shoulders, his midback and lower back, hips, and knees, as well as his left elbow.

Source:  Depo. Tr. of Stephen W. Gascoigne (P144, L1-P146, L22) [Exhibit 2].

Fact No. 32:  The Plaintiff had never experienced this kind of joint pain prior to the Dien-Dupont wedding and dinner/reception.

Source:  Depo. Tr. of Stephen W. Gascoigne (P146, L23-P147, L22) [Exhibit 2].

Fact No. 33:  After taking a history of the Plaintiff's symptoms and complaints, and after conducting a physical examination, Dr. Van Belois concluded that the Plaintiff had developed inflammatory arthritis after contracting Salmonella enteritidis at the Dien-Dupont wedding and dinner/reception.  Dr. Van Belois entered a diagnosis of reactive arthritis, Reiters type, and began a course of treatment.

Source:  Medical Records of Bernadette Van Belois, M.D. at Tamarack Medical Clinic, 1280 Burns Way, Kalispell, Montana [Exhibit 5].

Fact No. 34:  On December 17, 2002, the Plaintiff sought a second medical opinion from Dr. Robert Kowalewski, a rheumatologist and member of the Department of Rheumatology of the University of Washington Medical Center, 1959 N.E. Pacific Street, Seattle, Washington.  After taking a history of the Plaintiff's symptoms and complaints, and after conducting a physical examination, Dr. Kowalewski rendered a diagnosis of reactive arthritis, "still active", and recommended a course of treatment.

Source:  Medical records of Dr. Robert Kowalewski of University of Washington Medical Center Department of Rheumatology, 1959 N.E. Pacific Street, Seattle, Washington  [Exhibit 6].

Fact No. 35: On May 20, 2003, the Plaintiff sought a third medical opinion from Dr. Rodney Bluestone, a rheumatologist whose office is located at 436 North Bedford Drive, Suite 303, Beverly Hills, California. After taking a history of the Plaintiff's symptoms and complaints, and after conducting a physical examination, Dr. Bluestone diagnosed the Plaintiff as having reactive arthritis, post-infectitious in etrology, probably arising as a result of a gastrointestinal infection the Plaintiff suffered at the Dien-Dupont wedding and dinner/reception.

Source: Medical Records of Dr. Rodney Bluestone [Exhibit 7]. Affidavit of Dr. Rodney Bluestone [Exhibit 8].

Fact No. 36: On July 26, 2004, the Plaintiff Stephen Gascoigne returned to Massachusetts to be examined by Dr. Robert Kalish, a rheumatologist hired by the defense in this litigation. A complete copy was furnished to Dr. Kalish of Mr. Gascoigne's medical records concerning the diagnosis and treatment of his reactive arthritis. Dr. Kalish was allowed to view x-rays of Mr. Gascoigne taken at the request of Dr. Robert Kowalewski and Dr. Rodney Bluestone. When subsequently requested, Dr. Kalish was even provided with personal copies of said x-rays. Dr. Kalish stated his findings, observations, and conclusions in a report dated August 20, 2004. In said report, Dr. Kalish came to the following conclusion: "In summary, I do feel after examining Mr. Gascoigne and reviewing his x-rays that the diagnosis of salmonella induced reactive arthritis is probable."

Source: Report of Dr. Robert Kalish dated August 20, 2004 [Exhibit 9]. Responses No. 19, 20, and 21 of Defendant's Responses To Plaintiff's Request For The Admission Of Facts And Genuineness of Documents [Exhibit 11].

Fact No. 37: On or about June 24, 2005, the Defendant served responses to the Plaintiff's Request For The Admission Of Facts And Genuineness Of Documents. As part of its responses, the Defendant Wequassett Inn LLP made the following admissions:

    (i)    Certain persons who had been served food on its premises on or about July 6, 2001 reportedly suffered from a food borne illness [Response No. 3].

(ii)     The Massachusetts Department of Public Health (hereinafter, MPH), and the Harwich Board of Health (hereinafter, HBOH) investigated the source and the origin of the July 6, 2001 food borne illness at the Wequassett Inn.

(iii)     The MPH and HBOH issued a report which stated that, as part of their investigations, MPH and HBOH conducted a statistical analysis of stool samples obtained from and questionnaires completed by a number of the Dien-Dupont wedding party and invited guests who claim to be ill [Response No. 5].

(iv)     The MPH and HBOH issued a report which stated that a food borne illness had taken place, that the food borne illness was due to Salmonella, and that the strain of Salmonella involved was Salmonella enteritidis [Response No. 6].

(v)     The MPH and HBOH issued a report which stated two explanations for the mechanism by which the Salmonella enteritidis bacteria had been transmitted.  The first such explanation for what had occurred was that the béarnaise sauce prepared and served by employees, servants, and staff of the Wequassett Inn on July 6, 2001, at the Dien-Dupont dinner/reception was made wholly or in part with unpasteurized eggs contaminated with Salmonella enteritidis bacteria.  An alternative explanation suggested by the MPH and HBOH for what had occurred was that at least three of the Wequassett Inn food handlers at the event were already infected with Salmonella enteritidis bacteria and that these food handlers contaminated certain of the food served at the Dien-Dupont dinner/reception, including the béarnaise sauce, a phenomenon of transmission known as cross-contamination [Response Nos. 7 and 8].

(vi)     The Plaintiff Stephen Gascoigne subsequently developed reactive arthritis and that Salmonella enteritidis is a recognized cause of that condition [Response No. 12].

(vii)     The Defendant Wequassett Inn LLP does not have any expert testimony that the Plaintiff Stephen Gascoigne contracted Salmonella induced reactive arthritis from a source other than the food prepared by and served to him by the Defendant's employees, servants, agents, workers or staff at the Dien-Dupont wedding reception and dinner [Response No. 22].

(viii)     The Defendant Wequassett Inn LLP does not have any factual information that the Plaintiff Stephen Gascoigne contracted Salmonella induced reactive arthritis from a source other than the food prepared by and served to him by the Defendant's employees, servants, agents, workers or staff at the Dien-Dupont wedding reception and dinner [Response No. 23].

(ix)     The Defendant Wequassett Inn LLP does not have any lay witness testimony that the Plaintiff Stephen Gascoigne contracted Salmonella induced reactive arthritis from a source other than the food prepared by and served to him by the Defendant's employees, servants, agents, workers or staff at the Dien-Dupont wedding reception and dinner [Response No. 24].

Source:  Defendant's Response To Plaintiff's Request For The Admission Of Facts And Genuineness of Documents [Exhibit 10].  Defendant's Answer To Paragraph 15 of Plaintiff's Second Amended Complaint and Jury Claim [Exhibits 11 and 12] .

Fact No. 38:  The béarnaise sauce that was served to the Invest To Compete Dinner on July 6, 2001, and to the Dien-Dupont wedding and dinner/reception was prepared in a single batch in the main kitchen of the Wequassett Inn.

Source:  Depo. Tr. of William Brodsky (P17, L17-21; P21, L13-16) [Exhibit 13].

Fact No. 39:  The béarnaise sauce that was served to both the Invest To Compete Dinner to the Dien-Dupont wedding and dinner/reception was prepared and served by employees of the Wequassett Inn and not some outside vendor.

Source:  Depo. Tr. of William Brodsky (P22, L21-P23, L10) [Exhibit 13].

Fact No. 40:  In his deposition testimony, William Brodsky, the executive chef of the Wequassett Inn, agreed with the following findings and conclusions of the Massachusetts Department of Public Health that:

- (i) what had occurred at the Wequassett Inn on July 6, 2001, was a food borne illness (Depo. Tr. of William Brodsky, P43, L9-P44, L23) [Exhibit 13];

- (ii) the food borne illness was caused by Salmonella enteritidis (Depo. Tr. of William Brodsky, P45, L1-P46, L17) [Exhibit 13]; and

- (iii) the mechanism by which the Salmonella enteritidis was acquired by those who became ill was either (a) contamination during food preparation or service by a food handler or (b) was present in the food that was served at the Wequassett Inn (Depo. Tr. of William Brodsky, P46, L18-P47, L2) [Exhibit 13].

Fact No. 41:  Other than the explanations set forth in the report of the Massachusetts Department of Public Health, he has no additional explanations that would explain how the attendees at the investment conference and the persons who attended the Dien-Dupont wedding reception both contracted Salmonella enteritidis at the Wequassett Inn.

Source:  Depo. Tr. of William Brodsky (P64, L1-10) [Exhibit 13].

Fact No. 42: Brodsky testified that it is possible that the béarnaise sauce became contaminated after preparation by contact with the infected food handlers.

Source:  Depo. Tr. of William Brodsky (P58, L18-P59, L1) [Exhibit 13].

Fact No. 43:  Brodsky testified that he is not aware of any current investigation, laboratory testing or experiments that are ongoing on the part of the Wequassett Inn to determine any other causes for the Salmonella enteritidis outbreak that occurred on July 6, 2001, involving the Invest To Compete Conference and the Dien-Dupont wedding and dinner/reception.

Source: Depo. T. of William Brodsky, P62, L20-P63, L16) [Exhibit 13].

Fact No. 44:  Both William Brodsky, the executive chef of the Wequassett Inn, and Mark J. Novota, the managing partner of the Wequassett Inn, have testified that the Wequassett Inn has not identified any other likely source of the Salmonella infection other than the béarnaise sauce or cross-contamination.

Source:  Depo. Tr. of Mark J. Novota (P123, L4-8) [Exhibit 14].  Depo. Tr. of William Brodsky (P64, L1-10) [Exhibit 13].

Fact No. 45:  Both Brodsky and Novota went on to testify that the Wequassett Inn is not conducting any type of investigation or analysis of any kind as to any other potential causes of the Salmonella infection other than the béarnaise sauce and cross-contamination identified by the Massachusetts Department of Public Health.

Source:  Depo. Tr. of Mark J. Novota (P123, L15-22) [Exhibit 14].  Depo. Tr. of William Brodsky (P62, L20-P63, L16) [Exhibit 13].

Fact No. 46:  Both Brodsky and Novota further testified that that are not aware of any other possible explanation for what happened with respect to the Salmonella infection other than it being caused by the béarnaise sauce or cross-contamination from the three infected employee food handlers.

Source:  Depo. Tr. of Mark J. Novota (P123, L23-P124, L7; P135, L14-22) [Exhibit 14].  Depo. Tr. of William Brodsky (P64, L1-10) [Exhibit 13].

Fact No. 47: Novota has no explanation that would explain the fact that the attendees of the Invest To Compete dinner and the Dien-Dupont wedding dinner/reception both contracted Salmonella enteritidis of the same exact strain of Salmonella other than contamination during food preparation or food service or other than contamination being present in the food that was served at both functions.

Source:  Depo. Tr. of Mark J. Novota (P135, L14-22) [Exhibit 14].

Fact No. 48:  Both Brodsky and Novota admitted that no one at the senior management level at the Wequassett Inn felt that the Harwich Board of Health of the Massachusetts Department of Public Health had failed to properly investigate other possible explanations for the Salmonella outbreaks of July 6, 2001.

Source:  Depo. Tr. of Mark J. Novota (P141, L20-P142, L3) [Exhibit 14].  Depo. Tr. of William Brodsky (P64, L11-17) [Exhibit 13].

Fact No. 49:  The Wequassett Inn had an obligation to serve the Dien-Dupont wedding party food that was fit for consumption.

Source:  Depo. Tr. of Mark Novota (P142, L22-P143, L3) [Exhibit 14].  Depo. Tr. of William Brodsky (P65, L16-20) [Exhibit 13].

Fact No. 50:  If the explanations offered by the Massachusetts Department of Public Health are correct or conclusive, the Wequassett Inn breached or violated its obligation to serve the Dien-Dupont wedding party food that was fit for consumption.

Source:  Depo. Tr. of Mark Novota (P143, L4-14) [Exhibit 14].  Depo. Tr. of William Brodsky (P65, L21-P66, L4) [Exhibit 13].

Fact No. 51:  On July 6, 2001, at the Wequassett Inn, dinner was served to attendees of the Invest to Compete Conference and to the Dien-Dupont wedding party and invited guests.

Source:  Defendant's Answer No. 11 to Plaintiff's Interrogatories [Exhibit 15].

Fact No. 52: Numerous persons who attended the Dien-Dupont wedding and dinner/reception and persons who attended the Invest to Compete Conference claimed to have become ill as a result of consuming food served to them at the Wequassett Inn.

Source: Defendant's Answer No. 12 to Plaintiff's Interrogatories [Exhibit 15].

Fact No. 53: Stool samples taken from three employees and food handlers at the Wequassett Inn who worked on Friday, July 6, 2001, tested positive for Salmonella enteritidis:

    (a)    Martin Jehle, a cook;

    (b)    Jessica M. Miller, a pastry chef; and

    (c)    Robert S. Gianni, assistant server.

Source: Defendant's Answer No. 25 to Interrogatories of the Plaintiff Scott Dien in Scott Dien and Rebecca Dupont vs. Pleasant Bay Group, Inc., d/b/a The Wequassett Inn Resort and Golf Club, Barnstable (MA) Superior Court, Civil Action No. 04-352-A [Exhibit 16]. Depo. Tr. of William Brodsky (P41, L19-P42, L3) [Exhibit 13].

Fact No. 54: There was no procedure, practice or policy at the Wequassett Inn in effect as of July 6, 2001, for regular physical checkups or health screenings for its employees or food handlers.

Source: Defendant's Answer No. 24 to Interrogatories of the Plaintiff Rebecca Dupont in Scott Dien and Rebecca Dupont vs. Pleasant Bay Group, Inc., d/b/a The Wequassett Inn Resort and Golf Club, Barnstable (MA) Superior Court, Civil Action No. 04-352-A [Exhibit 16].

Fact No. 55: The Defendant Wequassett Inn LLP has not asserted any affirmative defenses to the Plaintiffs' causes of action.

Source: Defendant's Answer to Second Amended Complaint and Jury Claim [Exhibit 12].

Fact No. 56: In addition to those persons identified in the report of the Massachusetts Department of Public Health, the following persons became ill as a result of attending the Dien-Dupont wedding and dinner/reception:

    (i)    Andre Dupont, the father of the bride Rebecca Dupont [became ill approximately 36 hours after the dinner/reception and eventually suffered fever, chills, painful abdominal cramping with explosive diarrhea, nausea, muscle aches, and weakness] [had béarnaise sauce] (Depo. Tr. of Andre Dupont, P27, L9-P29, L14) [Exhibit 17].

(ii) Lou Ann Dien, mother of the groom Scott Dien [became ill morning and afternoon of July 7, 2001, and eventually suffered headaches, muscle aches, dizziness, fever, chills, fatigue, nausea, diarrhea, vomiting, weakness, burning sensation in mouth, cramping, and excruciating abdominal pain] (Depo. Tr. of Lou Ann Dien, P57, L16-P103, L9; P107, L22-P113, L1) [Exhibit 18].

(iii) Rudolph Dien, father of the groom Scott Dien [became ill the night of July 7, 2001, and eventually suffered diarrhea, achiness, fever, chills, wheezing, dizziness, headaches, fatigue, and abdominal cramping (Depo. Tr. of Rudolph S. Dien, P28, L20-P29, L10; P32, L22-P33, L20; P34, L10-16; P37, L19-P38, L2; P38, L24-P40, L23; P42, L19-P43, L3; P46, L14-24; P51, L9-P52, L4; P61, L21-P64, L18) [Exhibit 19].

(iv) John T. Gmelich, M.D., wedding guest [became ill the afternoon of July 7, 2001, and eventually experienced explosive diarrhea, malaise, muscle aches, chills, fever, headaches, fatigue, vomiting, abdominal cramping, sore and raw perineal area] (Depo. Tr. of John T. Gmelich, M.D., P52, L21-P53, L10; P54, L4-P55, L13; P56, L3-P57, L9) [Exhibit 20].

(v) Dolores Rose, wedding guest [became ill the morning of July 8, 2001, and eventually experienced stomach cramps, tender skin, fever, diarrhea, abdominal cramping, and weakness] (Depo. Tr. of Dolores Rose, P25, L9-P26, L6; P27, L19-P28, L8; P29, L18-23) [Exhibit 21].

Source:  Exhibits No. 17-21

                Respectfully submitted,

                _____
                Donald L. Gibson, Esquire
                BBO No. 191030
                DRISCOLL & GIBSON
                1000 Plain Street
                Marshfield, MA 02050
                781-837-6115
                Attorneys for the Plaintiffs,
                Stephen Gascoigne And Kelly Gascoigne,
                    Individually, And As Mother And Next
                    Friend Of Ad.G. And Ab.G, Both Minors

Dated:  January 9, 2006