**Vol. 1 - 1**

```
                                    Pages:  1 - 128
                                    Volume:  1
                                    Exhibits:  1



                COMMONWEALTH OF MASSACHUSETTS
BARNSTABLE, SS                    SUPERIOR COURT
                                 C.A. NO: 04-379A


* * * * * * * * * * * * * * * * *
RUDOLPH S. DIEN and LOU ANN DIEN,  *
                    Plaintiffs,    *
        v.                         *
PLEASANT BAY GROUP, INC., d/b/a    *
THE WEQUASSETT INN RESORT AND      *
GOLF CLUB,                         *
                    Defendant.     *
* * * * * * * * * * * * * * * * *


            DEPOSITION OF LOU ANN DIEN, taken

pursuant to Notice under the applicable provisions

of the Massachusetts Rules of Civil Procedure on

behalf of the Defendant, before Donna C. St-Aubin,

Registered Professional Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at the

offices of Tucker, Heifetz & Saltzman, LLP, Three

School Street, Boston, Massachusetts, commencing on

November 10, 2004, at 10:08 a.m.


        NEAL A. SALLOWAY - COURT REPORTERS
                FIVE CARDIGAN ROAD
        WEST PEABODY, MASSACHUSETTS 01960
(781) 581-3993 - (978) 535-0313 - FAX: (978) 536-3142
```

**Vol. 1 - 2**

```
APPEARANCES:
DONALD L. GIBSON, ESQ.
1000 PLAIN STREET
MARSHFIELD, MA 02050
   COUNSEL FOR THE PLAINTIFFS

WILLIAM P. McGOVERN, JR., ESQ.
TUCKER, HEIFETZ & SALTZMAN, LLP
THREE SCHOOL STREET
BOSTON, MA 02108
   COUNSEL FOR THE DEFENDANT
```

**Vol. 1 - 3**

```
                      I N D E X

Deponent     Direct    Cross   Redirect  Recross
LOU ANN DIEN
By Mr. McGovern    4                121
By Mr. Gibson            107

                    * * * * *


                  E X H I B I T S

EXHIBIT NO.      DESCRIPTION              PAGE NO.

  1       Health Department document.......... 55




                    * * * * *
```

**Vol. 1 - 4**

```
                                          Dien, Lou Ann
             S T I P U L A T I O N S

             (Commencing at 10:08 a.m.)


        It is hereby stipulated and agreed

by and between counsel for the respective

parties that all objections, except as to

form, are reserved until the time of trial,

including motions to strike.

        It is further stipulated and agreed

that the witness will read and sign the

deposition transcript; notarization is waived.

        It is further stipulated and agreed

that the filing and sealing of the deposition

are waived.

        MR. GIBSON:  As far as

stipulations, we'd like to reserve all

objections, except as to the form of the

question, and all motions to strike until the

time of trial.  We would like to read and sign

her deposition as well as her husband's

deposition.  We'd like to do that under the

pains and penalties of perjury, waiving the

notary, and they'll have thirty days to do
```

Vol. 1 - 5
Dien, Lou Ann

1  that from the date that I receive my copies of
2  the transcript.
3          MR. McGOVERN:  That's exactly
4  right.
5
6          LOU ANN DIEN
7       A witness called on behalf of the
8  Defendant, first having been duly sworn, under
9  oath, deposes and says as follows:
10
11 DIRECT EXAMINATION:
12 Q.  (By Mr. McGovern) Good morning, Ms. Dien.  My
13     name is William McGovern, and I'm representing
14     the defendant in this lawsuit.  I'm going to
15     be asking you a number of questions today.
16     The woman sitting to your left is a
17     stenographer.  She's going to be taking down
18     everything that is said today on the record,
19     and a transcript will be produced.
20          For that reason, I'm going to ask
21     that you respond to my questions with words,
22     because it may be impossible for her to take
23     down gestures and nods of the head and so

Vol. 1 - 6
Dien, Lou Ann

1  forth.  So I'll try to remind you, if that
2     becomes necessary, to ask you to respond in
3     words, as opposed to gestures or saying
4     "um-hmn" or those sorts of responses.
5  A.  Okay.
6  Q.  Secondly, if you do not understand a question
7     that I'm asking, please let me know, and I'll
8     try to say it in a different way.  I want us
9     both to have an understanding as to what the
10    question is, and that way your responses will
11    be clearer.
12 A.  Okay.
13 Q.  And, thirdly, if you want to take a break for
14    any reason whatsoever, speak up and let me
15    know, and I'll be happy to do that for you?
16 A.  Okay.
17 Q.  Would you state your full name?
18 A.  Lou Ann Dien.
19 Q.  Is Lou Ann two words?
20 A.  It's two words.
21 Q.  Okay.  And it's L-O-U, capital A-N-N?
22 A.  Correct.
23 Q.  What is your date of birth?

Vol. 1 - 7
Dien, Lou Ann

1  A.  June 11th, 1942.
2  Q.  And what is your Social Security number?
3  A.  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.
4  Q.  And I understand that you are married; is that
5     correct?
6  A.  Yes.
7  Q.  What is your husband's name?
8  A.  Rudolph Stephen Dien.
9  Q.  And he's, in fact, in the room with us today;
10    is that correct?
11 A.  Yes.
12 Q.  How long have you been married, or when were
13    you married?
14 A.  February 18, 1962 -- '61, sorry.
15 Q.  You would be surprised on how many do not get
16    that question right.
17         What is your maiden name?
18 A.  Lou Ann Huntoon.
19 Q.  Can you spell that, please?
20 A.  H-U-N-T-O-O-N.
21 Q.  What is your current address?
22 A.  5010 Hill Street, LaCanada, California.
23 Q.  Can you spell LaCanada?

Vol. 1 - 8
Dien, Lou Ann

1  A.  Capital L-A, capital C-A-N-A-D-A, 91011.
2  Q.  Okay.  And how long have you lived at that
3     address?
4  A.  Since 1967, June.
5  Q.  Do you have any children?
6  A.  Yes.
7  Q.  How many?
8  A.  We have four.
9  Q.  Okay.  And what are their names?
10 A.  Stephen.
11 Q.  With a V-or P-H?
12 A.  P-H.
13         Scott, Sandra, and Sarah with an H.
14 Q.  Okay.  What are your children's ages?
15 A.  Scott -- I mean Stephen is 40; Scott is 38;
16    Sandra is 36, and Sarah is 28.
17 Q.  Okay.  Is Stephen married?
18 A.  Yes.
19 Q.  What is his wife's name?
20 A.  Michelle.
21 Q.  And his last name is Dien?
22 A.  Yes.
23 Q.  Scott is married, I understand?

Vol. 1 - 9
Dien, Lou Ann

1    A.  Yes.

2    Q.  And his wife's name?

3    A.  Is Rebecca.

4    Q.  Is Sandra married?

5    A.  Yes.

6    Q.  What is her husband's name?

7    A.  Brad, Bradford.

8    Q.  And the last name?

9    A.  Is Kelley, K-E-L-L-E-Y.

10   Q.  Okay.  And is Sarah married?

11   A.  No.

12   Q.  And is her last name Dien?

13   A.  Correct.

14   Q.  All right.  Are you currently employed?

15   A.  No.

16   Q.  As you're aware, I'm going to be asking you

17       some questions about an incident at a wedding

18       in July of 2001.  Were you employed at that

19       time?

20   A.  Yes.

21   Q.  Okay.  Who was your employer at that time?

22   A.  I was self-employed.  I had a day care in my

23       home --

Vol. 1 - 10
Dien, Lou Ann

1    Q.  Okay.

2    A.  -- a licensed day care in my home.

3    Q.  Did your business have a name?

4    A.  Dien Family Day Care.

5    Q.  What kind of entity was that?  Was that a

6        corporation?

7    A.  No.

8    Q.  Okay.  Did you register that with the state?

9    A.  Yes.

10   Q.  Okay.  Is Dien Family Day Care still in

11       business?

12   A.  No.

13   Q.  Okay.  When did that business stop?

14   A.  The exact date or approximately?

15   Q.  Well, if you know, the exact date.

16   A.  I don't.

17   Q.  Okay.

18   A.  It would be approximately a year ago now.  We

19       retired, and then I kept my license for about

20       a year.

21   Q.  Okay.  So roughly November of 2003?

22   A.  I would say maybe January of 2004.

23   Q.  Okay.  You said that "we retired."  Was there

Vol. 1 - 11
Dien, Lou Ann

1        someone else involved in that business with

2        you?

3    A.  No.  My husband retired, and so I retired to

4        be with him.

5    Q.  Okay.  Did your husband have any involvement

6        in Dien Family Day Care?

7    A.  He was listed in our home, and he did the

8        background check for our day care.  He didn't

9        participate in the day care.

10   Q.  Okay.  What do you mean by "listed"?

11   A.  When you get a license for a day care in your

12       home, you have to list people that would be in

13       contact with the children in your presence.

14   Q.  Okay.

15   A.  And so anybody over the age of 18 had to have

16       a background check, and he was that part of

17       it.

18   Q.  He did the background checks?

19   A.  No.  He was -- he had a background check so

20       that when the children were in my home he

21       could be there with them and read them

22       stories, or whatever.

23   Q.  I understand.  Was anyone else listed?

Vol. 1 - 12
Dien, Lou Ann

1    A.  We had to list all of our children --

2    Q.  Okay.

3    A.  -- when they turned 18.

4    Q.  Is anyone other than your husband and your

5        children listed?

6    A.  Would you -- are you meaning my helpers that

7        would come in?  Could I ask you that?

8    Q.  Let me ask you about that then.  Did you have

9        other people that helped you in the day care

10       business?

11   A.  Yes.  They would come in.  When I had a full

12       day care in, I had to have help.

13   Q.  Okay.  As of January 2004, roughly the time

14       that you stopped the business, how many

15       helpers did you have at that time?

16   A.  One part-time.

17   Q.  Okay.  And by part-time, how many hours per

18       week would that person work?

19   A.  Roughly four hours per week.

20   Q.  As of January 2004, were you working at that

21       business full time?

22   A.  Yes.

23   Q.  Okay.  I'm going to ask you to explain, sort

Vol. 1 - 13
Dien, Lou Ann

```
 1      of, your answer, anyway.  How many hours per
 2      week would you work in the day-care business?
 3   A. Okay.  When I said -- January of nineteen --
 4      of 2004, I gave up my license then, but I quit
 5      my day care the previous June of '03.
 6   Q. Okay.  I understand.
 7   A. Okay.  But I held it in case I started back
 8      up.
 9   Q. And you've been talking a little bit about a
10      license.  What is the name of the license that
11      you had?
12   A. It's a state -- California State license for
13      day-care providers.
14   Q. Okay.
15   A. And I also had a city license.  Gave it up at
16      the same time.
17   Q. Is that also a day-care provider license with
18      the same --
19   A. Yes.
20   Q. All right.  Let me ask you then about around
21      June 2003, which as I understand now is when
22      your day-care business ended.  Did you have
23      any helpers at that time?
```

Vol. 1 - 14
Dien, Lou Ann

```
 1   A. Yes.
 2   Q. How many helpers did you have then?
 3   A. One.
 4   Q. Was that a part-time helper?
 5   A. Yes.
 6   Q. And roughly four hours per week that person
 7      was working for you?
 8   A. Yes.
 9   Q. All right.  At that time how many children
10      were you caring for?
11   A. Six.
12   Q. What age range of children were you caring for
13      at that time?
14   A. The age range was from birth to about seven
15      years old, eight years old, but when -- my day
16      care was an open day care, and I took care of
17      children 24 hours a day, so they could come
18      and go any time.
19   Q. How would that work?  Would the parent make a
20      schedule with you to bring their children in
21      at certain times?
22   A. Yes.
23   Q. And how did you charge parents for day care?
```

Vol. 1 - 15
Dien, Lou Ann

```
 1   A. I charged them $3 per hour per child.
 2   Q. How long were you involved in the day-care
 3      business?
 4   A. Roughly 36 years.
 5   Q. When did you start Dien Family Day Care?
 6   A. As Dien Family Day Care (indicating), possibly
 7      18 years ago.
 8   Q. Okay.  According to my math, roughly 1984 or
 9      thereabouts?
10   A. If this has to be an exact date, I would have
11      to look at my records, because prior to that I
12      babysat in my home for all of my friends'
13      kids.
14   Q. Okay.
15   A. So we were -- and then we built up to the
16      point to have our own day care.  We decided to
17      have it be Dien Family Day Care, so --
18   Q. Okay.
19   A. -- if I have to answer it, it could have even
20      been 1980.  I'm trying to relate it to my last
21      daughter when we started the whole -- sorry.
22   Q. That's fine.  I appreciate your answer.  I'm
23      just asking for what your best memory is as
```

Vol. 1 - 16
Dien, Lou Ann

```
 1      you're sitting here today.  If you can't, sort
 2      of, give me an exact date or year, that's
 3      fine.  Just let me know that.
 4   A. It could have been just 1980; it could have
 5      been right in there.
 6   Q. Okay.  Fair enough.
 7          As I understand it, before you
 8      started the business as Dien Family Day Care,
 9      were you caring for children before then?
10   A. Yes.
11   Q. Okay.  And was that as a business, or is this
12      something that you just did outside of a named
13      business?
14   A. It was for friends' children, and they did pay
15      me.
16   Q. Okay.
17   A. But it wasn't going into a business at that
18      time.
19   Q. Okay.  Fair enough.
20          From the time that you started the
21      Dien Family Day Care business until the
22      present, have you been employed by any other
23      employer?
```

Vol. 1 - 17
Dien, Lou Ann

1  A.  No.

2  Q.  Okay.  And from the time you started Dien

3      Family Day Care, have you been, I guess,

4      working that business full time?

5  A.  Yes.

6  Q.  Have you ever had more than one helper?

7  A.  Yes.

8  Q.  Okay.  What is the largest number of helpers

9      that you had at any one time?

10 A.  Two.

11 Q.  Did that happen, sort of, more than once,

12     or --

13 A.  No.

14 Q.  When was it that you had two helpers?

15 A.  Oh, it would be off and on.  When we were very

16     busy, I would have two come in if I couldn't

17     handle the children that were there that

18     needed more work, so --

19 Q.  Okay.  All right.  What is the most number of

20     children that you cared for at any one time?

21 A.  We had four children, so, with that, probably

22     ten or twelve with my four children.  Do you

23     mean in a day, in an hour, or in the year?

---

Vol. 1 - 18
Dien, Lou Ann

1  Q.  Let me ask a better question then.

2  A.  Because my day care was -- it was a different

3      kind of a day care, when I may have four

4      children Monday, six children Tuesday, one on

5      Wednesday, so --

6  Q.  Okay.

7  A.  -- so I don't know how I can answer that

8      because I have -- my records will show I have

9      30 or 50 children, but that could be that they

10     come once a month, or they come, you know --

11     so --

12 Q.  I think I understand.

13 A.  Okay.  I hope.

14 Q.  Let me approach it this way.

15 A.  Um-hmn.

16 Q.  Why don't you describe for me, in general, how

17     your day care worked, how the schedule was

18     arranged?

19 A.  Okay.  I had my monthly calendar, and then

20     people that knew me -- people came to me that

21     knew me, usually.  If they didn't, it was word

22     of mouth.  I never had to advertise.

23 Q.  Okay.

---

Vol. 1 - 19
Dien, Lou Ann

1  A.  They would call me and say, I want to go play

2      tennis on Thursday.  That will be this block

3      (indicating) Thursday, one to four; I'll put

4      them in from one to four.  Somebody else would

5      say, I need a full-time baby-sitter; I have to

6      go back to work, so they will be every day.

7      Then somebody else would call and say, We're

8      going to go on a trip.  The one I'm thinking

9      about is when they went to China, and they

10     used me for three weeks straight, so I'm 24

11     hours.  That's how.

12 Q.  Okay.  All right.  Now, did you maintain

13     records that would show which child was there

14     on which date?

15 A.  Yes.

16 Q.  Do you still have those records?

17 A.  I have most of the records.

18 Q.  Okay.

19 A.  On disks.

20 Q.  Computer disk?

21 A.  Yes.

22 Q.  Now, as of -- I understand at the time that

23     your business ended, you were charging $5 per

---

Vol. 1 - 20
Dien, Lou Ann

1      hour per child?

2  A.  Correct.

3  Q.  Was that what you were charging as of July of

4      2001?

5  A.  Correct.

6  Q.  Okay.

7  A.  Could I check that on my records?

8  Q.  Sure.  If you're not sure and --

9  A.  Because I did do incremental raising.  I think

10     at that time it was $5 an hour.  I only raised

11     it 25 cents when I did, so it could have been

12     4.75.

13 Q.  Did you charge the same rate to all the

14     children you cared for at any one time?

15 A.  All except my own grandchildren.

16 Q.  That's probably a wise business decision.

17         You indicated, I think, that you

18     stopped the business in 2003 because you had

19     decided to retire; is that correct?

20 A.  Correct.

21 Q.  Did your retirement have anything to do with

22     the incident regarding the salmonella at the

23     July 2001 wedding?

Vol. 1 - 21
Dien, Lou Ann

1  A.  No.
2  Q.  Was that retirement planned?
3  A.  Planned in one way because my husband had to
4     retire, so I did retire.  It wasn't planned
5     four years ago or three years ago that I would
6     retire on that date.
7  Q.  Okay.  Why did your husband have to retire?
8  A.  Because in his work -- he had worked there
9     eleven years, and they had said that he had --
10    if he worked there ten years, he would get his
11    retirement plan.  At the time, in 2003, they
12    changed, and they changed the years to 15
13    years, and that meant that we would be older,
14    so we retired then so he could take advantage
15    of the ten years of working for them.
16 Q.  Okay.  I understand.  And I'm going to be
17    asking your husband, I guess, more about that
18    later on, but who did your husband work for at
19    that time?
20 A.  Anheuseur-Busch, Van Nuys, California.
21 Q.  What did your husband do?
22 A.  He was a maintenance engineer.
23 Q.  All right.  You indicated that for some period

Vol. 1 - 22
Dien, Lou Ann

1     of time after your business closed you held
2     onto your day care provider license?
3  A.  (Nodded head up and down.)
4  Q.  Did that license expire?
5  A.  It was due to expire this year.
6  Q.  Okay.
7  A.  So -- I had to get my license yearly for both
8     state and city.
9  Q.  Okay.
10 A.  And the first year that I retired I could have
11    not renewed it, because at that point I did
12    know that we were going to retire.
13 Q.  Okay.
14 A.  But just to be on the safe side, I decided to
15    keep everything, renew insurance and both
16    licenses for one year to have a backup.
17 Q.  Okay.  Now, did you use your license at all
18    after your business closed?
19 A.  No.
20 Q.  Okay.  All right.  I'm going to ask you some
21    questions about your general medical history.
22    Let me ask you first, do you have any food
23    allergies?

Vol. 1 - 23
Dien, Lou Ann

1  A.  No.
2  Q.  Are there any foods that you avoid for reasons
3     other than distaste?
4  A.  No.
5  Q.  And other than the incident stemming from the
6     July 2001 wedding, have you ever had food
7     poisoning at any other time?
8  A.  No.
9  Q.  Are you presently on any medication?
10 A.  I have Lipitor and vitamins.
11 Q.  How long have you been on Lipitor?
12 A.  I would say three years.
13 Q.  Were you taking Lipitor at the time of the
14    July 2001 wedding?
15 A.  No.
16 Q.  Who was the doctor that prescribed Lipitor?
17 A.  Dr. Carol Thrun.
18 Q.  How do you spell her last name?
19 A.  T-H-R-U-N, M.D.
20 Q.  Is she your primary care doctor?
21 A.  Yes.
22 Q.  How long has she been your doctor?
23 A.  Possibly -- I don't know the month of 1991.

Vol. 1 - 24
Dien, Lou Ann

1  Q.  As of July 2001, were you taking any
2     medications?
3  A.  No.
4  Q.  Did your weight change at all as a result of
5     the salmonella incident?
6  A.  Yes.
7  Q.  What was your weight at the time of the
8     wedding?
9  A.  I would say it could have been around 145.  Do
10    I have to have the exact -- it was around --
11 Q.  If you don't know the exact, you can tell me
12    that you're estimating.
13 A.  I'm estimating.  Thank you.
14 Q.  What is your current weight?
15 A.  One, fifty-five.
16 Q.  Now, did you lose weight as a result of the
17    salmonella incident?
18 A.  Yes.
19 Q.  How much weight did you lose, if you know?
20 A.  About 12 to 15 pounds.
21 Q.  And you eventually gained that weight back?
22 A.  Yes.
23 Q.  Do you know when it was that you returned to