COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, SS.    SUPERIOR COURT DEPARTMENT
C.A. NO. 04-384

JOHN T. GMELICH AND DOLORES ROSE,

    Plaintiffs

vs.

PLEASANT BAY GROUP, INC., D/B/A THE WEQUASSETT INN RESORT AND GOLF CLUB,

    Defendant

DEPOSITION OF JOHN T. GMELICH, taken pursuant to Notice under the applicable provisions of the Massachusetts Rules of Civil Procedure, on behalf of the Defendant, before Alice M.S. DesVergnes, R.P.R., a Notary Public in and for the Commonwealth of Massachusetts, at the office of Tucker, Heifetz & Saltzman, LLP, Three School Street, Boston, MA 02108, commencing on Wednesday, December 8, 2004, at 10:00 a.m.

APPEARANCES:

    DONALD L. GIBSON, ESQ.
    DRISCOLL & GIBSON
    1000 PLAIN STREET
    MARSHFIELD, MA 02050
      Counsel for the Plaintiffs

    WILLIAM P. McGOVERN, JR., ESQ.
    TUCKER, HEIFETZ & SALTZMAN, LLP
    THREE SCHOOL STREET
    BOSTON, MA 02108
      Counsel for the Defendant

ALSO PRESENT: Dolores Rose

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
(781) 581-3993 (978) 535-0313 FAX (978) 535-3142

---

        I N D E X

DEPONENT                 DIRECT   CROSS   REDIRECT
JOHN T. GMELICH
    By Mr. McGovern    5              90
    By Mr. Gibson               88

        E X H I B I T S

EXHIBIT NO.   DESCRIPTION              PAGE NO.
1    Harwich Health Dept. form             42
2    Thank you note from Ms. Champagne     43
3    John Gmelich's report from N.J.       60
    Department of Health
4    Dolores Rose's report from N.J.       61
    Department of Health
5    Letter dated July 23, 2001            83

---

        S T I P U L A T I O N S

    It is hereby stipulated and agreed by and between counsel for the respective parties that all objections, except as to form, are reserved until the time of trial, including motions to strike.

    It is further stipulated and agreed that the reading and signing of the deposition are not waived. Notarization is waived.

    MR. GIBSON: I'd just like to put the stipulations between counsel on the record. All objections except as to the form of the question and all motions to strike will be reserved until the time of the trial.

    We will exercise our right to read and sign the deposition. We'd like to do that under the pains and penalties of perjury, waiving the notarization, and will accomplish that within 30 days after I receive my copy of the transcript.

    I do reserve the right, however, to instruct my client not to answer any questions

Vol. 1 - 5

1  that calls for the disclosure of privileged
2  information. Other than that you're certainly
3  free to inquire.
4  MR. MCGOVERN: Agreed.
5  JOHN T. GMELICH, having duly
6  affirmed that his testimony will be the truth,
7  the whole truth, and nothing but the truth and
8  having produced a valid Passport for
9  identification purposes, testified as follows
10  in answer to direct interrogatories by Mr.
11  McGovern:
12  Q  Good morning. My name is Bill McGovern. I'm
13  representing the Pleasant Bay Group, Inc.,
14  D/B/A the Wequassett Inn Resort and Golf Club.
15  I'm sure your attorney has told you a
16  little bit about what's going to happen today
17  so I'm not going to do that again. I just
18  would ask you that if you want to take a break
19  at any time, I'd be happy to let you do that.
20  A  Thank you very much.
21  Q  Please state your name.
22  A  John Thomas Gmelich.
23  Q  And spell your last name for me, please.

Vol. 1 - 6

1  A  G-M-E-L-I-C-H.
2  Q  What's your date of birth?
3  A  November the 5th, 1938.
4  Q  What is your Social Security number?
5  A  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.
6  Q  What's your present address?
7  A  54725 Inverness Way, La Quinta, capital L-A,
8  capital Q-U-I-N-T-A, California, 92253.
9  Q  How long have you lived at that address?
10  A  Approximately five years.
11  Q  Are you married?
12  A  Yes.
13  Q  Who is your wife?
14  A  Dolores.
15  Q  She is also in the room with us today?
16  A  Yes, she is.
17  Q  What's her last name?
18  A  Rose, R-O-S-E.
19  Q  How long have you been married to Dolores Rose?
20  A  Since '99.
21  Q  Is that your first marriage?
22  A  No. My late wife died in '97.
23  Q  What was her name?

Vol. 1 - 7

1  A  Her name was Ellen, E-L-L-E-N, Casey,
2  C-A-S-E-Y.
3  Q  How long were you married to Ellen?
4  A  Since 1966.
5  Q  Do you have any children?
6  A  Four.
7  Q  What are their names?
8  A  Griffin, G-R-I-F-F-I-N, Justin, J-U-S-T-I-N,
9  Geneva, G-E-N-E-V-A, Kiera, K-I-E-R-A.
10  Q  What are the ages of your children?
11  A  Griffin, 38, Justin, 36, Geneva, 34, Kiera, 30.
12  Q  Does anyone other than yourself and your wife
13  live at the Inverness Way address?
14  A  No.
15  Q  Did you live there in July of 2001?
16  A  Yes.
17  Q  Was anyone else living there in July, 2001,
18  other than you and your wife?
19  A  No.
20  Q  Are you presently employed?
21  A  Presently retired, but I do consultation work.
22  Q  What was your occupation when you retired?
23  A  Doctor of medicine.

Vol. 1 - 8

1  Q  When did you retire?
2  A  1997.
3  Q  A copy of what I understand to be your CV was
4  produced to me earlier. I'm going to show you
5  that now.
6  (Document exhibited to the witness.)
7  Q  If you would take a look at that for me please
8  and if you can identify that.
9  MR. GIBSON: Should be eight pages. Will
10  you make certain all eight pages are there?
11  A  Yes.
12  Q  Are you able to identify that document?
13  A  Yes, I am.
14  Q  What is that?
15  A  My curriculum vitae.
16  Q  Is that current?
17  A  Pretty much so.
18  Q  You indicated that you presently do some
19  consultation work?
20  A  Yes.
21  Q  In July of 2001, were you doing consultation
22  work?
23  A  Yes.

Vol. 1 - 9

| | | |
|---|---|---|
| 1 | Q | Describe for me what -- strike that. |
| 2 | | What kind of doctor were you, meaning at |
| 3 | | the time that you retired? |
| 4 | A | I was and still am a pathologist. |
| 5 | Q | At that time did you have any board |
| 6 | | certifications? |
| 7 | A | I'm board-certified in anatomical pathology, |
| 8 | | clinical pathology, with subspecialty boards in |
| 9 | | dermatopathology and cytopathology. |
| 10 | Q | Where were you practicing at the time you |
| 11 | | retired? |
| 12 | A | I practiced in Huntington Memorial Hospital, |
| 13 | | Pasadena, California. |
| 14 | Q | Why did you retire? |
| 15 | A | I had a heart attack. |
| 16 | Q | When was your heart attack? |
| 17 | A | September of 1997. |
| 18 | Q | Describe for me the consultation work that you |
| 19 | | have done, I guess, well, since the time you |
| 20 | | retired. Is that when you started doing |
| 21 | | consultation work? |
| 22 | A | No, I was doing consultation work when I was in |
| 23 | | active practice. |

Vol. 1 - 10

| | | |
|---|---|---|
| 1 | Q | Let me ask you this then: Why don't you |
| 2 | | describe for me the type of consultation work |
| 3 | | you have done since the time of your |
| 4 | | retirement. |
| 5 | A | I've been a consultant to Richard Allan, |
| 6 | | A-L-L-A-N. It's a pathology -- pathology |
| 7 | | corporation. On advising them as to |
| 8 | | procedures, stains, methodology. I invented |
| 9 | | a -- a stain technique with the present |
| 10 | | chairman of the board. |
| 11 | Q | What is the name of the corporation? |
| 12 | A | Richard Allan is the name of the corporation. |
| 13 | Q | And are they located in California? |
| 14 | A | They're located in Kalamazoo, Michigan. |
| 15 | Q | What is the frequency of the work that you do |
| 16 | | for Richard Allan? |
| 17 | A | It's probably once a year. |
| 18 | Q | How much work do you do once a year? |
| 19 | A | In addition to that I do medical legal |
| 20 | | consultations. |
| 21 | Q | Do you do that for Richard Allan? |
| 22 | A | No, as an individual for different lawyers. |
| 23 | Q | I'll ask you about that in a moment. The work |

Vol. 1 - 11

| | | |
|---|---|---|
| 1 | | that you do for Richard Allan, you said it's |
| 2 | | roughly once per year. How much time would you |
| 3 | | spend in a year on Richard Allan work? |
| 4 | A | It involved a trip to Washington DC, I think |
| 5 | | that was three days. And then a trip to the |
| 6 | | headquarters at Kalamazoo, Michigan, I think |
| 7 | | that was three or four days, I don't remember. |
| 8 | Q | Now, those trips -- |
| 9 | A | And then there was a local meeting held in the |
| 10 | | Palm Springs area which was for three or four |
| 11 | | days. And we met at a meeting in New Orleans, |
| 12 | | one of the large pathology meetings in New |
| 13 | | Orleans and that was for three or four days. |
| 14 | | And right now I don't remember anything else. |
| 15 | Q | Now, these events, were those the -- I think |
| 16 | | you have described to me four trips? |
| 17 | A | Um-hm. |
| 18 | Q | Were those trips that you take annually or were |
| 19 | | those one-time trips? |
| 20 | A | Well, they occurred about -- those were the |
| 21 | | trips for once a year about every year. So |
| 22 | | it's annually, would be the trips, and then I |
| 23 | | would speak to them over the telephone. |

Vol. 1 - 12

| | | |
|---|---|---|
| 1 | Q | How are you paid by Richard Allan? |
| 2 | A | I was given an option of money or fishing trips |
| 3 | | and I chose the latter. |
| 4 | Q | Tell me about how that works with the fishing |
| 5 | | trips. |
| 6 | A | Successfully. |
| 7 | Q | Did they -- do you go with a group of |
| 8 | | colleagues from Richard Allan? |
| 9 | A | I went with the chairman, his wife, Dolores, |
| 10 | | two or three other technical people in the |
| 11 | | company. I don't -- I can't remember whether |
| 12 | | or not the president of the company was there |
| 13 | | or not. I don't think so. I think I just |
| 14 | | played golf with the president. |
| 15 | Q | And how many fishing trips have you been on |
| 16 | | with the folks you mentioned? |
| 17 | A | I've been on that one and several fishing -- |
| 18 | | several golf outings. |
| 19 | Q | I'm sorry, I want to make sure I understand. |
| 20 | | One fishing trip? |
| 21 | A | One fishing trip -- |
| 22 | Q | And several golf outings. |
| 23 | A | -- several golf outings. |

```
 1  Q   Now, you also do medical legal consultation?
 2  A   That's correct.
 3  Q   Were you doing that kind of work -- were you
 4      doing medical legal consultation before you had
 5      the heart attack in 1997?
 6  A   Yes.
 7  Q   Are there -- strike that.
 8          Do you do that within a company or is that
 9      something that you sort of do on your own?
10  A   It's an individual practice of medicine, so on
11      my own, I guess, is the most proper answer I
12      can give you.
13  Q   Describe for me how that works.
14  A   I have an expertise in pulmonary pathology and
15      in cytopathology and there was a lung course in
16      which I taught -- was commenced at Yale and
17      then moved out to the West Coast, sharing
18      locations between the University of California
19      San Diego and Stanford University.
20          And several of the members that taught
21      that course were asked by different lawyers to
22      examine tissues as to whether or not it was
23      asbestos-related damage.
```

```
 1  Q   And you were one of those people --
 2  A   That's correct.
 3  Q   -- that they asked?  Do you work for -- strike
 4      that.
 5          How are you paid for that work?
 6  A   You mean what my rates were or do I receive
 7      money?  I received money.
 8  Q   I guess that's the first question.  So you were
 9      paid for that work?
10  A   Yes.
11  Q   Are you paid by lawyers or --
12  A   I was paid by the law firms.
13  Q   Did you enter into contracts for specific work
14      on a specific case or is it a year-long
15      contract or how was your payment arranged?
16  A   They called and asked me if I would review a
17      case and I would say yes.
18  Q   Were you charging by the hour for that work?
19  A   I charged by the hour, yes.
20  Q   What do you charge per hour?
21  A   What I did charge per hour, I believe it was
22      350 an hour.
23  Q   I notice you used the past tense.  Do you still
```

Vol. 1 - 15

Vol. 1 - 16

```
 1      do medical legal consultation?
 2  A   Yes, but the price is not the same anymore.
 3  Q   What is the current rate?
 4  A   Well, I haven't had actually a consultation in
 5      probably six months, but it would probably go
 6      up to 400, $500 an hour.
 7  Q   On the average since 1997, how much would you
 8      make in a year doing medical legal consultation
 9      work?
10  A   I would say anywhere between twenty and forty
11      thousand dollars.
12  Q   All right.  As you're aware, the reason you're
13      here today is for an incident that occurred at
14      a wedding in July of 2001.  Who got married on
15      that day?
16  A   Scott Dien.  Rebecca Dupont.
17  Q   Are you related to either Scott or Rebecca?
18  A   No.
19  Q   You were at the wedding though, correct?
20  A   Yes.
21  Q   What is your connection to the wedding?
22  A   I have known the groom since he was -- well, at
23      least for 20 years.  He was a friend of the
```

```
 1      family, friend of one of my sons.
 2  Q   Which son was he --
 3  A   He was closest with Justin.
 4  Q   Let me back up a little bit.  Other than the
 5      consultation record you've described for me
 6      already, have you done any other work since the
 7      time of your retirement in 1997?
 8  A   I consult for an agricultural company,
 9      microbiology.
10  Q   What's the name of the company?
11  A   JM Farms.
12  Q   Are you paid for that work?
13  A   I have a different type of agreement.  We're
14      working on a patent.
15  Q   What's the nature of that agreement?
16  A   I get portions of the money once the patent
17      gets filed.
18  Q   How long have you been doing working for JM
19      Farms?
20  A   Probably four years.
21  Q   How much work do you do for them; can you
22      estimate number of hours or days or --
23  A   I'd say so far this year it has been three to
```

1    500 to 800 hours.
2  Q  That's in 2004?
3  A  So far this year.
4  Q  Were you doing work for JM Farms in 2001?
5  A  Yes.
6  Q  Can you estimate how many hours of work you did
7     for JM Farms in 2001?
8  A  That's a long time ago. It would be a very
9     rough estimate. Maybe a hundred hours.
10 Q  Do you keep track of the time that you spend on
11    that work?
12 A  No, because that's not the -- the mechanism of
13    my reimbursement is whether or not we get
14    marketable ideas from our efforts.
15 Q  All right. Other than what you've described
16    for me already, have you done any other work
17    since the time of your retirement in 1997?
18 A  Right now I can't think of any more.
19 Q  Did you lose any earnings from the salmonella
20    incident from the July, 2001 wedding?
21 A  I was really disabled for a period of at least
22    a month where I didn't want to do anything but
23    lay around and hide.

1  Q  And that was roughly one month?
2  A  Yes.
3  Q  Were there any or -- strike that.
4     Was there any consultation work that you
5     turned down during that month?
6  A  I don't recall.
7  Q  Was there any work that had to be reassigned to
8     someone because you were unable to do it?
9  A  If I had to, I would just postpone it.
10 Q  And do you recall specifically postponing any
11    work?
12 A  No. No, I don't.
13 Q  Have you lost any earning capacities as a
14    result of the salmonella incident?
15    MR. GIBSON: Object to the form of the
16    question. You may answer if you understand it.
17 A  Could you rephrase it for me?
18 Q  Sure. The complaint that's been filed in this
19    case suggested that there was a loss of earning
20    capacity as a result of this incident.
21    So what I understand that to mean is that
22    you've lost the ability to earn money from work
23    as a result of this incident. Is that true?

1     MR. GIBSON: Object to the form of your
2     question. You can answer it if you understand
3     it and refer to total or partial incapacity.
4  A  Can you read it back to me, please?
5     (Question was read back by the Court
6     Reporter.)
7     (Pause for Court Reporter.)
8  A  I relate this incident to the progression of --
9     MR. GIBSON: I just want to have the same
10    objection on the record. Go ahead, please.
11    You can answer.
12 A  I relate the salmonella incident to the
13    progression of my coronary artery disease, and
14    it's been shown that there's a relationship
15    between inflammation and the progression of
16    arthrosclerosis. It's even in lay press, the
17    TIME Magazine.
18    I had coronary bypass surgery in January
19    of 2003 which laid me up for six months
20    enabling me from doing almost anything, and it
21    was consequently followed by a radical
22    prostatectomy in June of 2003.
23    The other conditions that I ascribed to as

1     being precipitated and enhanced by salmonella
2     infection is osteoarthritis of my right hip.
3     That's the limiting factor in walking and
4     enjoying my pastimes of golf, exploration, et
5     cetera.
6  Q  I'm going to ask you about that a little later
7     on.
8  A  Sure.
9  Q  What I'm interested in for the moment is the
10    lost earnings.
11    The bypass surgery that you had in
12    January, 2003, who performed that surgery?
13 A  It was done at Scripps Hospital.
14 Q  Is that spelled S-C-R-I-P-P-S?
15 A  S-C-R-I-P-P-S.
16 Q  Where is that located?
17 A  In La Jolla, capital L-A, capital J-O-L-L-A,
18    California.
19 Q  Who was the surgeon?
20 A  I'm desperately trying to remember the name of
21    the cardiac surgeon and it's failing.
22 Q  If you think of it later on just --
23 A  I'll be happy to provide it.

Vol. 1 - 21

1  Q  Who is your cardiologist?
2  A  Yup. He is also at Scripps. I will have to
3     remember his name later as well.
4  Q  When was it determined that you were going to
5     have the bypass surgery?
6  A  End of December.
7  Q  Of '02?
8  A  Of 2002.
9  Q  Did you have coronary artery disease in July of
10    2001?
11 A  I had stents that repaired the stenosis.
12 Q  So by January, I'm sorry, December of 2002
13    those stents were no longer adequate?
14 A  There was a progression. It was noticed in my
15    exercise, et cetera, that there was a rapid
16    progression of what was my coronary artery
17    disease.
18 Q  And is it your testimony that that progression
19    changed after the salmonella incident?
20 A  I think it was increased by the salmonella
21    incident.
22 Q  Did you ever discuss that with your
23    cardiologist?

Vol. 1 - 22

1  A  Briefly. We were going to try to document it
2     better in the literature.
3  Q  As far as you know, does your cardiologist
4     agree that the salmonella incident --
5  A  We --
6  Q  Let me try to finish the question first.
7  A  Sorry.
8  Q  Does your cardiologist agree that the
9     salmonella incident increased the progression
10    of your coronary artery disease?
11 A  He agrees that an episode of inflammation
12    increases the inflammatory cascade which
13    increases the progress of arthrosclerosis as a
14    general principle.
15 Q  You also talked about osteoarthritis in your
16    right hip?
17 A  Um-hm.
18 Q  When were you diagnosed with osteoarthritis of
19    the right hip?
20 A  I think it was at the end of 2001.
21 Q  Did you have right hip symptoms, if you will,
22    before that time?
23 A  I really became in pain when I was up in Utah

Vol. 1 - 23

1     and that was after the wedding in Cape Cod.
2     And I was able to get an x-ray of the location
3     there and it proved that there was
4     osteoarthritis.
5  Q  So is it fair to say that the first time you
6     experienced the right hip problems was when you
7     were in Utah?
8  A  No, I think the arthritis is a slowly
9     developing disease. But it was just, like, the
10    exacerbation.
11 Q  I want to make sure I understand, then. Are
12    you saying the first time that you experienced
13    the exacerbation of it was in Utah?
14 A  Yes, I think so.
15 Q  That was sometime following July, 2001?
16 A  Yes.
17 Q  Do you know when in 2001 you were in Utah?
18 A  I think it was probably August or September.
19    July, August, or September. Can't be July.
20    August or September.
21 Q  Why were you in Utah?
22 A  Visiting relatives.
23 Q  Has your osteoarthritis resulted in fewer hours

Vol. 1 - 24

1     that you're able to work?
2  A  I have to get up and move. You know, it sort
3     of breaks the concentration.
4  Q  All right. Let me ask you some questions about
5     the wedding and the days before and afterwards.
6     What was your original plan for coming to
7     Massachusetts for the wedding and then your
8     plan for the days following the wedding?
9  A  Well, our home base was Newark, New Jersey.
10    No, correction. Flying in to Newark, New
11    Jersey, and then going to Rumson, New Jersey,
12    where my son lives.
13 Q  Which son?
14 A  Justin. And at that time, my son Griffin lived
15    in Long Beach, New York. He has two
16    brother-in-laws. So we went from Rumson to
17    Long Beach and Long Beach to Cape Cod and we
18    arrived in Cape Cod, I believe, on the 28th.
19 Q  To get from Newark to Cape Cod, was that a
20    one-day trip or did you take several days to go
21    to Rumson and Long Beach?
22 A  I think it was probably one day in Rumson and
23    one day in Long Beach and then up to Cape Cod.

| | | |
|--|--|--|
| 1 | | But those are estimates. |
| 2 | Q | Fair enough. How did you get from Newark to |
| 3 | | Rumson? |
| 4 | A | Rented a car. |
| 5 | Q | Was your wife with you on the flight? |
| 6 | A | Yes. |
| 7 | Q | Did anybody else travel with you that was in |
| 8 | | your group? |
| 9 | A | No. |
| 10 | Q | When had you planned to return to California? |
| 11 | A | I think it was the 21st or the 23rd, one of the |
| 12 | | two. |
| 13 | Q | Were you planning to stay in Cape Cod |
| 14 | | throughout that time? |
| 15 | A | No. We were -- we went to Cape Cod on the |
| 16 | | 28th. There was another wedding the week |
| 17 | | before that we attended. Another friend of the |
| 18 | | family. |
| 19 | Q | Who was that? |
| 20 | A | Her maiden name was Mary Azzarto, |
| 21 | | A-Z-Z-A-R-T-O. Her mother, Jackie Azzarto, is |
| 22 | | Justin's godmother and was my late wife's best |
| 23 | | friend. |

| | | |
|--|--|--|
| 1 | Q | Where did that wedding take place? |
| 2 | A | I think it's Hyannis Port. It was next to the |
| 3 | | Hyannis hotel that we stayed at which was the |
| 4 | | Sheraton Hotel. |
| 5 | Q | What day did that wedding take place? |
| 6 | A | The Saturday before, the 6th of June. |
| 7 | | MR. GIBSON: You mean the 6th of July? |
| 8 | A | Pardon? |
| 9 | | MR. GIBSON: You mean the 6th of July? |
| 10 | A | Yeah, the week -- the 6th of July. |
| 11 | Q | You were staying at a Sheraton? |
| 12 | A | I believe it -- yes. |
| 13 | Q | Where is the Sheraton? |
| 14 | A | Hyannis. |
| 15 | Q | Did you stay at that Sheraton for your entire |
| 16 | | time at the Cape? |
| 17 | A | No. |
| 18 | Q | How long did you stay at the Sheraton? |
| 19 | A | From the 28th to the -- through the 30th. |
| 20 | Q | Did you leave the Cape on the 30th? |
| 21 | A | No. |
| 22 | Q | Where did you go from there? |
| 23 | A | To a beach house or, actually, it's not a beach |

| | | |
|--|--|--|
| 1 | | house, it was a very large house that my son, |
| 2 | | Justin, rented. |
| 3 | Q | Where was the house located? |
| 4 | A | I'm sorry, I didn't hear you. |
| 5 | Q | Where was the house located? |
| 6 | A | I honestly don't remember the name of the town. |
| 7 | | Almost on the water, though. |
| 8 | Q | How long had you rented that house for? |
| 9 | A | Justin rented the house for, I believe, seven |
| 10 | | days. |
| 11 | Q | Who stayed in the house? |
| 12 | A | Justin, Victoria, his two children. |
| 13 | Q | Let me stop you there. Victoria is his wife? |
| 14 | A | Yes. |
| 15 | Q | Okay. |
| 16 | A | Two grandchildren, my two daughters, my son |
| 17 | | Griffin, Dolores and I. |
| 18 | Q | Okay. |
| 19 | A | I believe a couple friends of Justin's. One I |
| 20 | | remember is Charles Ferragaro, |
| 21 | | F-E-R-R-A-G-A-R-O. There could have been |
| 22 | | several more. And then there was another |
| 23 | | couple that showed up with children and I |

| | | |
|--|--|--|
| 1 | | forgot their name. |
| 2 | Q | So there was a big group there? |
| 3 | A | It was a very large house. Very large house. |
| 4 | Q | Did everyone stay there for the entire week? |
| 5 | A | No. The couple that showed up with the |
| 6 | | children were only there for two or three days. |
| 7 | Q | Do you know who Justin rented that house from? |
| 8 | A | No, I do not. |
| 9 | Q | Did you and your wife stay there for the full |
| 10 | | week? |
| 11 | A | From the 30th to the 6th. |
| 12 | | MR. GIBSON: We've been going an hour. Do |
| 13 | | you mind if we get up and stretch and take a |
| 14 | | little break? |
| 15 | | (Recess taken.) |
| 16 | Q | Can you remind me where I left off, read the |
| 17 | | last question back? |
| 18 | | (Previous question and answer read back by |
| 19 | | the Court Reporter.) |
| 20 | A | I'd like to add two parties to the house. It |
| 21 | | was Mr. George and Mrs. Carol Hall, H-A-L-L. |
| 22 | | It's Victoria's mother and father. |
| 23 | Q | All right. Now, what had you originally |